*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOEL HOSEA HARDING,

Defendant-Appellant.

UNPUBLISHED
July 10, 2025
11:38 AM

No. 366367
Macomb Circuit Court
LC No. 2021-002541-FH

Before: MALDONADO, P.J., and BOONSTRA and WALLACE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of five counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(d) (incest). Defendant was sentenced, as a third-offense habitual offender, MCL 769.11, to 10 to 30 years' imprisonment for each CSC-III conviction. We affirm.

## I. FACTUAL BACKGROUND

This case involves several incidents of sexual intercourse between defendant and the complainant, JH, who is defendant's adult daughter, both before and while defendant was living with JH in her home. By way of background, defendant sexually assaulted JH several times during her childhood. The incidents were eventually reported to the authorities. Defendant was convicted of second-degree criminal sexual conduct (CSC-II) in relation to those sexual assaults and imprisoned. He was released before the events giving rise to the present prosecution and appeal.

In early 2019, defendant sent JH, who was by that time an adult, a letter. JH was "worried" and "a little afraid" when she received the letter, after years of no contact with defendant, but nevertheless decided to respond. The two made plans to meet in person and have dinner. During the dinner, the two "just talked," which JH testified felt "fine." On a second occasion, JH picked up defendant and brought him to her condominium where they watched a movie. During this encounter, defendant and JH began kissing and then had penile-vaginal intercourse. Eventually, defendant moved into JH's condominium. JH explained at trial that she invited defendant to move in with her "[t]o have my dad back." She believed she was in love with defendant, and the two continued to have sexual intercourse with each other. They also shared a bedroom.

-1-

JH eventually decided to purchase a larger single-family home. She felt she needed space from defendant. JH set up her bedroom in the finished basement, and defendant lived on the main level of the home. JH's feelings about the relationship began to change around the time of the COVID-19 pandemic. When JH informed defendant that she did not want to continue a sexual relationship with him, he would not leave her alone, forcing her to install a lock on the basement door to keep him out. Nevertheless, defendant broke the lock to get inside the basement. In October 2020, JH rented a motel room to get away from defendant. While JH was at the motel, defendant sent her many text messages, including some threatening to kill himself.

JH and defendant had sexual intercourse one final time in November 2020. JH was drinking alcohol and took an Ambien to help her cope with the stress of her situation. She recalled that defendant "tried to coerce" her into having sex, and she attempted to push him off her. She does not recall what happened next, but knew the next morning that they engaged in sexual intercourse the night before. Defendant then moved out of JH's home, and within a few months, JH reported him to the police.

At trial, social worker James Henry, Ph.D., testified as an expert in "child sexual abuse and trauma." Dr. Henry explained that trauma affects people through the stages of life, including into adulthood. He testified that a trauma bond occurs when there is harm in a relationship. The relationship develops on the basis of fear and the requirement to meet the parent's needs to survive. Even as an adult, when an individual reunites with a family member they have not seen in some time who committed abuse on the individual during childhood, that individual can revert to acting like a young child again or begin to romanticize the parent-child relationship.

Around the time he moved out of JH's home, defendant's behavior was brought to the attention of Macomb County Adult Protective Services, and guardianship and mental-health treatment matters were opened in the probate court. Defendant, who had a mental-health history, was hospitalized for mental-health treatment in December 2020 before receiving additional mental-health treatment in jail pending the charges in this case.

Defendant was charged with five counts of CSC-III. Defendant underwent two competency examinations through the Center for Forensic Psychiatry (CFP). CFP psychologist Margo Gilbert, Ph.D., concluded defendant was competent to stand trial and could be found criminally responsible. She explained that defendant "was not laboring under a mental condition such that he was incapable of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner."

During the pretrial proceedings, the prosecution filed a notice of intent to introduce other-acts evidence under MCL 768.27b and MRE 404(b) in relation to defendant's prior CSC-II conviction. Defendant argued that the evidence was improper character evidence under MRE 404(a), and that, for purposes of MRE 403, the danger of unfair prejudice would substantially outweigh the probative value of the evidence. The trial court ruled that the other-acts evidence was relevant and admissible. Thus, the jury heard about defendant's prior conduct and received evidence of his CSC-II conviction.

The issue of defendant's competency to stand trial also arose several times during the pretrial proceedings after defendant made bizarre statements and engaged in disruptive behavior

at several points. Defense counsel requested an independent competency and culpability examination, which the court ordered. Following a lengthy administrative delay attributable to the examiner's schedule, defendant was independently evaluated by psychologist Michael Abramsky, Ph.D., in December 2022. In his report, Dr. Abramsky concluded that defendant was competent to stand trial and could be found criminally responsible.

During an early January 2023 pretrial hearing, defense counsel stated defendant was not contesting competency or culpability because of the results of the independent examination.[1] The court found defendant competent and able to be found criminally responsible. At the start of trial, defendant made several bizarre statements, including the following: "I have what I believe to be a microchip under my fingernail. It wasn't there before." He added: "I am under unlawful surveillance and eavesdropping. I'm being attacked by an electric magnetic weapon. I can't escape from that." The court declined to consider these statements as evidence that defendant required yet another competency examination, explaining as follows:

> I'm satisfied and I'm looking at—and in this Court—the Court is also satisfied with your mental competency. In this case, we've done multiple competency examinations. You've had competence reviewed by both the State and your own personal expert, all of which have come back and said you are competent to stand trial. And so this Court is satisfied with your competency.

Defendant remarked as follows:

> And I want to say this and I just brought this up. Right now because of the way that I feel and I can say that it has also been found by numerous cases that a person can be incompetent at any phase of the hearings. Right now I don't have the wherewithal to withstand the emotional pressure of a trial. So—

The proceedings continued, and on the second day of trial, the prosecutor moved to preclude any reference at trial to defendant's mental illness, hospitalizations for mental illness, or related mental-illness treatment, and the guardianship. The trial court agreed that the evidence was not relevant to any issue at trial because defendant was competent and could be found criminally responsible. Defendant waived his right to testify, and the defense presented no other witnesses or evidence. After deliberating, the jury found defendant guilty of all five counts of CSC-III.

Defendant was sentenced as stated earlier and this appeal followed. While the case was on appeal, but before defendant's appellate brief was due in this matter, defendant moved to remand the case to the trial court for a new trial or an evidentiary hearing to expand the record. He also filed a pro se motion to remand. This Court denied both motions to remand for failure to persuade the Court of the need for a remand at that time. *People v Harding*, unpublished order of the Court of Appeals, entered May 23, 2024 (Docket No. 366367). However, this Court noted that the denial

---

[1] The record shows that defense counsel's statement about not contesting "culpability" was intended to communicate that he was not contesting the fact that, pursuant to the above-referenced reports, defendant could legally be found culpable, i.e., could be found criminally responsible.

was without prejudice, and granted defendant's request to submit to this Court the exhibits attached to his brief on appeal. *Id*.

## II. INSANITY DEFENSE

Defendant first argues on appeal that the trial court erred by prohibiting any mention at trial of defendant's mental illness, hospitalizations, guardianship, or treatment, which effectively prevented him from raising a not guilty by reason of insanity (NGRI) defense. He adds that defense counsel was ineffective because he failed to pursue an NGRI defense. We disagree with both arguments.

To present an NGRI defense to the trial court, the defendant must file and serve a written notice of his intention to assert an NGRI defense 30 days before the trial date, or at another time that the court directs. MCL 768.20a(1). If the defendant fails to file and serve the notice, then the court must exclude evidence offered to establish an insanity defense. MCL 768.21(1). There is no dispute that defendant did not file the notice of intent necessary to raise an insanity defense in the trial court. In fact, defendant's attorney clarified for the record after receiving the results of an independent psychological examination that he was *not* going to raise an NGRI defense. Counsel's statement constituted a waiver of the issue. Waiver is defined "as the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). " 'One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.' " *Id*. (citation omitted). Nevertheless, considering defendant has a related ineffective-assistance claim, we will briefly address the merits of his potential NGRI defense. To the extent defendant also raises a due-process argument about his NGRI defense, a defendant preserves claims of constitutional error by presenting them to the trial court. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). Defendant did not present a constitutional argument in the trial court, rendering it unpreserved. See *id*.

Regarding defendant's broader challenge to the court's preclusion of evidence about his mental illness, "[t]o preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). On the second day of trial, the prosecutor moved in limine to preclude any references to defendant's mental illness, hospitalizations, treatment, or guardianship. Defense counsel did not oppose the motion, but pointed out that defendant raised an NGRI defense at some point in the proceedings. The trial court addressed the issue on the record and ruled that any evidence bearing on defendant's mental health would not be admitted at trial. Therefore, because the objection was raised at trial on the same ground at issue in this appeal, this evidentiary issue is preserved. See *id*.

A defendant preserves the issue of ineffective assistance of counsel by moving the trial court for a new trial, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or by moving this Court to remand the case for a *Ginther*[2] hearing, *People v Abcumby-Blair*, 335 Mich App 210,

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-4-

227; 966 NW2d 437 (2020). There is no dispute defendant did not move for a new trial or *Ginther* hearing. Defendant's motion to remand in this Court incorporated a broad request to remand for a *Ginther* hearing, but defendant's argument on ineffective assistance related to another topic and did not raise this issue. Therefore, this issue is unpreserved. See *id*.

The issue whether a defendant was denied his right to present a defense is ordinarily a question of law that we review de novo. *King*, 297 Mich App at 472. However, defendant did not preserve the issue for appellate review. So we review the claim for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. The third prong of this test requires a showing of prejudice, meaning that the error affected the outcome in the trial court. *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764. (quotation marks and citation omitted; alteration in original).

Regarding defendant's challenge to the court's preclusion of evidence about his mental health, we review evidentiary issues for an abuse of discretion. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 191 (2011). An abuse of discretion occurs when the trial court's ruling falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 270; 666 NW2d 231 (2003). Decisions regarding the admissibility of evidence often involve preliminary questions of law, such as whether a statue or rule of evidence precludes admissibility of the evidence, and we review questions of law de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999); *People v Galloway*, 335 Mich App 629, 637; 967 NW2d 908 (2021).

A claim of ineffective assistance of counsel involves a mixed question of fact and constitutional law. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). We review the trial court's findings of fact for clear error, and the legal questions involved de novo. *Id*. Clear error occurs when this Court is left with a definite and firm conviction that a mistake was made. *Id*. We review unpreserved claims of ineffective assistance of counsel for errors apparent on the record. *People v Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019).

A criminal defendant has a state and federal constitutional right to a meaningful opportunity to present a complete defense in the case. *King*, 297 Mich App at 473. But that right is subject to reasonable restrictions as required to advance the legitimate interests in the criminal-trial process. *Id*. More specifically, a criminal defendant must follow the rules of criminal procedure and evidence. *Id*. at 474. Moreover, the restrictions on presenting evidence outlined in the Michigan Rules of Evidence do not violate the defendant's right to present a defense as long as those rules are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *People v Unger*, 278 Mich App 210, 250; 749 NW2d 272 (2008) (quotation marks and citation omitted). In other words, the defendant's right to present a defense "extends only to relevant and admissible evidence." *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016) (quotation marks and citation omitted). A criminal defendant also has the right to a trial by jury, which can only be waived through the defendant's knowing and voluntary waiver. *People v Cook*, 285 Mich App 420, 422; 776 NW2d 164 (2009). A defendant is entitled to a presumption of

innocence throughout the proceedings until the prosecution proves he is guilty beyond a reasonable doubt. *People v Beck*, 504 Mich 605, 621; 939 NW2d 213 (2019).

Legal insanity is a recognized affirmative defense in Michigan. *People v Carpenter*, 464 Mich 223, 230-231; 627 NW2d 276 (2001). See also MCL 768.21a(1). The Legislature has defined the term "legally insane" to mean:

> if, as a result of mental illness as defined in . . . MCL 330.1400, or as a result of having an intellectual disability as defined in . . . MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. [MCL 768.21a(1).]

However, "[m]ental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity." *Id*. The defendant bears the burden of proving the NGRI defense by a preponderance of the evidence. MCL 768.21a(3).

Typically, a defendant files a notice of intent to offer an NGRI defense at trial within the time frame discussed above. MCL 768.20a(1). Upon receiving the notice of intent, the court then orders a CFP examination. MCL 768.20a(2). The defendant may also secure an independent evaluation. MCL 768.20a(3). The evaluators will then prepare reports and submit them to the attorneys. MCL 768.20a(6). The prosecution may file and serve a notice of rebuttal of the NGRI defense. MCL 768.20a(7). When the defendant has asserted an NGRI defense in a criminal matter tried before a jury, the judge must instruct the jury on the law relevant to the insanity defense. MCL 768.29a(1). Additionally,

> [a]t the conclusion of the trial, *where warranted by the evidence*, the charge to the jury shall contain instructions that it shall consider separately the issues of the presence or absence of mental illness and the presence or absence of legal insanity and shall also contain instructions as to the verdicts of guilty, guilty but mentally ill, not guilty by reason of insanity, and not guilty with regard to the offense or offenses charged and, as required by law, any lesser included offenses. [MCL 768.29a(2) (emphasis added).]

Alternatively, the Legislature has provided that when the defendant has asserted an NGRI defense, the jury may find the defendant " 'guilty but mentally ill' " (GBMI) if it finds the following:

> (a) The defendant is guilty beyond a reasonable doubt of an offense.
>
> (b) The defendant has proven by a preponderance of the evidence that he or she was mentally ill at the time of the commission of that offense.
>
> (c) The defendant has not established by a preponderance of the evidence that he or she lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. [MCL 768.36(1).]

The critical issue here is whether the NGRI instruction (and by extension, the GBMI instruction) was warranted by the evidence. See MCL 768.29a(2). Our Supreme Court has clarified that the NGRI defense is an "all or nothing" defense, and a defendant may not avoid criminal responsibility or negate a showing of specific intent by presenting evidence of some form of mental incapacity short of meeting the requirements of the NGRI defense (i.e., by establishing a mental illness but not demonstrating a lack of substantial capacity). *Carpenter*, 464 Mich at 237. Michigan also does not recognize a "diminished capacity" defense. See *id.* at 237, 239. The phrase "criminal responsibility" in this context generally refers to the defendant's ability to be relieved of all criminal responsibility through the NGRI defense, as opposed to a finding that the defendant is GBMI, which does not relieve the defendant of criminal responsibility. See *People v Stephan*, 241 Mich App 482, 491-493; 616 NW2d 188 (2000).

## A. RIGHT TO A JURY TRIAL

Defendant first argues the trial court violated his right to a trial by jury and violated the presumption of innocence by entering a pretrial order finding defendant "criminal[ly] responsible." Defendant argues the court's ruling essentially functioned as a directed verdict of guilty, amounting to a violation of his right to a jury trial. Although the court did not permit defendant to present testimony regarding his mental health or the guardianship, and ruled defendant could be found criminally responsible, it did not rule on the ultimate issue of defendant's guilt of the charged crimes. Rather, the court left that issue for the jury to decide following a three-day trial. The trial court's finding regarding culpability essentially functioned as a finding that defendant was competent to stand trial and that the NGRI defense could not be raised at trial, which did not deny defendant's right to a trial by jury or otherwise violate defendant's presumption of innocence.[3]

## B. NGRI DEFENSE

Even assuming defendant did not waive the NGRI defense, the evidence did not warrant an NGRI instruction. Before trial, the court ruled, in relevant part, as follows:

> The court adopts the competency and culpability reports submitted by the Center for Forensic Psychiatry as well as defense expert Dr. Abramsky and finds the defendant competent to stand trial and culpable in that there are no expert opinions or reports to the contrary as of this date[.]

---

[3] In other words, based upon our review of the record, it is clear that the section of the pretrial order entered by the trial court referencing defendant's "competency and culpability" was limited to the issue of whether defendant lacked substantial capacity either to appreciate the nature and quality or the wrongfulness of his conduct or to conform his conduct to the requirements of the law under MCL 768.21a(1). The trial court found that the reports submitted by the Center for Forensic Psychiatry and Dr. Abramsky demonstrated that defendant did not lack such capacity and that those reports were unrebutted by defendant, i.e., that section of the order was merely a ruling on the issue of MCL 768.21(a)(1) and not an adjudication of guilt. Our interpretation of the order is corroborated by the fact that the issue of defendant's guilt was subsequently submitted to the jury, i.e., it was the jury that determined that defendant was guilty in this case, not the trial court.

The court's ruling followed a discussion on the record in which defense counsel indicated he was not raising an NGRI defense. When defendant interjected on the record, defense counsel explained that defendant seemed to want to say that he is not culpable. Defendant added he also wanted to say "[s]omething else." The trial court responded as follows:

> So, Counsel, I mean I can set a hearing on the culpability. I mean, the evidence that you're providing me on his side establishes his culpability. So, I mean, I don't—he—he may disagree with that.
>
> Sir, you may disagree with that, but there's no evidence to the contrary, and so the Court is finding it. I don't need a stipulation. I don't need— I have reports, both of which —both on the defense side, and on the prosecution side, that establish that you're both competent and culpable.

The issue arose again during the second day of trial, when the prosecutor requested that the court preclude the admission of testimony relating to defendant's mental illness, mental-health treatment, hospitalizations, and guardianship. The court explained that it already ruled on competency and that defendant had not raised an NGRI defense. The court found that guardianship was a "totally different" statutory scheme and did not apply in this case. The court further concluded that it already ruled on competency, and that it did not sound like defense counsel was asserting an NGRI defense. When defense counsel indicated defendant believed he *had* raised an NGRI defense, the court noted that there was a finding from the CFP and the independent expert that defendant was culpable, i.e., he was capable of understanding the wrongfulness of the alleged conduct, that the issue was not raised throughout the case (i.e., the trial), and that defendant had been evaluated by a defense expert, such that the court was satisfied that the issue had been addressed. The court additionally noted defendant would not be qualified to testify on the issue because he was not an expert and lacked credentials.

In view of the court's discussion of the issue on the record, and considering the lack of evidence supporting defendant's position, we conclude the trial court did not deprive defendant of his right to present an NGRI defense. Defendant does not offer any expert testimony to support his position and appears to rely solely on his own proposed testimony, as well as the evidence relating to his guardianship and civil-commitment proceeding. Defendant's testimony was not sufficient to support his NGRI defense. At the time of trial, MRE 702 provided, in relevant part:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702, as amended July 22, 2003, 469 Mich cxci (2004).]

Defendant lacked the expertise to establish that he was legally insane under the legal definition of the term or even that he had a qualifying mental illness. Rather, specialized knowledge would be required by an expert qualified through skill, knowledge, experience,

training, or education to opine on whether defendant met the statutory definition of "mental illness" and whether he lacked substantial capacity. See MCL 768.21a(1). At most, defendant's testimony may have been used, as lay testimony, to support an expert's findings. See *People v Parker*, 133 Mich App 358, 361-362; 349 NW2d 514 (1984).[4] But defendant could not rely on his own lay witness testimony alone to establish that he met the statutory definition of legal insanity. See *Ake v Oklahoma*, 470 US 68, 80-81; 105 S Ct 1087; 84 L Ed 2d 53 (1985). Therefore, the trial court did not err by declining to allow defendant to present an NGRI defense or by declining to read the NGRI instruction to the jury.

## C. REMAND IS UNNECESSARY

We further conclude remand is unnecessary. First, the record is sufficiently developed to allow for appellate review of the trial court's rulings, and defendant's testimony was insufficient to support his NGRI defense. Second, the documentation and testimony defendant proposes to present to the trial court does not support his NGRI defense.

In defendant's motion to remand, defendant suggests the trial court should conduct an evidentiary hearing to supplement the existing record with the following evidence:

- Portions of defendant's 2004 mental-health records from the Michigan Department of Corrections (MDOC), associated with his CSC-II conviction, in which defendant was diagnosed with a personality disorder.

- Orders and petitions from the guardianship case.

- A mental-health evaluation performed on defendant in relation to the guardianship case indicating he suffered from schizophrenia.

- A petition filed to have defendant submitted for mental-health treatment in a separate civil-commitment matter.

- Defendant's written statement in which he outlines how he would have testified if he testified on his own behalf at trial.

Defendant adds in his Standard 4 brief that the trial court should have considered evidence relating to his guardianship to show he had schizophrenia.

Even if the trial court had considered these documents, they do not establish that defendant was entitled to assert an NGRI defense a trial. To start, defendant's documentation about his 2004 personality-disorder diagnosis does not support his NGRI defense. Defendant does not cite any legal source that would support that having a personality disorder qualifies as legally insane under

---

[4] Pre-November 1, 1990 decisions of this Court are not strictly binding on this Court, see MCR 7.215(J)(1), but these opinions are still considered precedent and are entitled to significantly more deference than unpublished opinions. *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019).

MCL 768.21a(1). Defendant's documentation regarding his guardianship and the civil-commitment proceedings (including a document diagnosing him with schizophrenia) also would not support an NGRI defense. The guardianship and civil-commitment proceeding were probate matters governed by separate statutory schemes. Guardianships are governed by the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*. MCL 700.5306, a provision of EPIC, provides, in relevant part, that

> [t]he court may appoint a guardian if the court finds by clear and convincing evidence both that the individual for whom a guardian is sought is an incapacitated individual and that the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual, with each finding supported separately on the record. [MCL 700.5306(1).]

EPIC defines the term "incapacitated individual" as

> an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions. [MCL 700.1105(a).]

In contrast, MCL 768.21a provides a different definition of "legal insanity," which, as noted earlier, requires a finding of a mental illness or intellectual disability, as well as a lack of substantial capacity. MCL 768.21a(1). Therefore, the fact that the probate court determined defendant met the legal standard for a guardianship would not establish that he was legally insane for purposes of his criminal trial.

Similarly, for purposes of the 2020 civil-commitment proceeding, although the NGRI defense borrows the definition of mental illness from the Mental Health Code, MCL 330.1400 *et seq*., the statute also requires a defendant to establish that he lacks substantial capacity to appreciate the nature and quality of the wrongfulness of his conduct or to conform his conduct to the law. See MCL 768.21a(1). This standard is different from the standard for issuing an order for involuntary mental-health treatment, as outlined in the Mental Health Code, which requires clear and convincing evidence that the individual is a "person requiring treatment," but does not contain the substantial-capacity language. *In re Portus*, 325 Mich App 374, 386-386; 926 NW2d 33 (2018); MCL 330.1465. The evidence from defendant's 2020 civil-commitment proceeding could not have been used to establish defendant had a mental illness at the time of his trial nearly three years later, or that he lacked substantial capacity.

The Supreme Court's opinion in *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), contradicts defendant's assertion that his entitlement to assert an insanity defense at trial was supported by the above-referenced findings under EPIC and/or the Mental Health Code. Specifically, the Court held:

> The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of

legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established by the Legislature is the *sole standard* for determining criminal responsibility as it relates to mental illness or retardation. Consequently, we affirm the decision of the Court of Appeals on this alternative basis. [*Id*. at 241 (emphasis added).]

Our finding on this issue is supported by this Court's prior decision in *People v Shaholli*, unpublished opinion of the Court of Appeals, issued June 21, 2016 (Docket No. 325399), pp 15-16, where we held that the trial court did not err when it refused to admit as evidence, in support of the defendant's insanity defense, orders issued by the Macomb County Probate Court appointing a guardian and a conservator for the defendant because such evidence was inadmissible under *Carpenter*.[5]

For these reasons, we find that remand is unwarranted.

## D. DEFENDANT'S MENTAL-HEALTH EVIDENCE

Regarding defendant's related argument about whether he should have been permitted to testify about his mental-health conditions, treatments, guardianship, or hospitalizations, defendant does not argue that the testimony about his mental health would have been relevant to any defense other than insanity, or that it was relevant to any of the elements of CSC-III. Therefore, the court did not err in precluding the admission of evidence relating to defendant's mental health, treatment, hospitalization, or the guardianship. See MRE 401 and 402.

As to defendant's argument in his Standard 4 brief that the trial court should not have allowed adverse evidence regarding culpability at trial because defendant did not raise an insanity defense, defendant does not provide any legal support for his position and has abandoned it on appeal. See *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims.") (quotation marks and citation omitted).

## E. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues, in one sentence in his principal brief, that he was prevented from presenting an NGRI defense because of "trial counsel's ineffectiveness." We disagree.

To establish a claim of ineffective assistance of counsel entitling the defendant to a new trial, " 'a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different.' " *People v Yeager*, 511 Mich 478, 488; 999 NW2d

---

[5] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Kennard v Liberty Mut Ins Co*, 341 Mich App 47, 53 n 2; 988 NW2d 797 (2022) (quotation marks and citation omitted).

490 (2023) (citation omitted). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant does not articulate the factual basis for his ineffective-assistance claim, thus abandoning the issue on appeal. See *Payne*, 285 Mich App at 195. Even if he had, trial counsel adequately investigated the issue by requesting an independent examination, and was not deficient for failing to pursue an insanity defense after defendant's own independent expert concluded, only a month before trial, that defendant was competent and could be found criminally responsible. Without any additional evidence to support the NGRI defense, the defense was meritless. See *Ericksen*, 288 Mich App at 201.

## III. WAIVER OF RIGHT TO TESTIFY

Defendant next argues the trial court's ruling precluding his testimony about his mental-health history effectively deprived him of his right to testify at trial, rendering his waiver of his right to testify involuntary. We disagree.

When the defendant decides not to testify or agrees with his attorney's decision against testifying, " 'the right will be deemed waived.' " *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985) (citation omitted). The general rule is that a criminal defendant can waive constitutional rights, but the waiver must be personal and informed. *People v Gonzalez-Raymundo*, 308 Mich App 175, 187; 862 NW2d 657 (2014). However, in the context of the right to testify, the trial court is not obligated to advise the defendant of the right or determine whether the waiver was knowing and intelligent. *People v Harris*, 190 Mich App 652, 661-662; 476 NW2d 767 (1991). There is no dispute that defendant waived his right to testify on the record. Rather, the dispute is over whether the waiver was voluntary in light of the court's prior evidentiary ruling precluding evidence about defendant's mental illness.

We review for clear error a trial court's factual findings relating to a defendant's waiver of a right, and review de novo any related issues about the interpretation of a law or a constitution. *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004). A criminal defendant has a constitutional right to testify in his own defense at trial. *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). This Court has held that "an accused's right to convey his side of the story to the jury is contained in the constitutional guarantee of due process of law." *Simmons*, 140 Mich App at 684. Defense counsel must advise the defendant about the right, but the defendant retains the ultimate decision whether to testify at trial. *Bonilla-Machado*, 489 Mich at 419 And if the defendant expresses a desire to testify at trial, the trial court must grant that request even over defense counsel's objection. *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020). However, the defendant may waive this right by deciding against testifying or by acquiescing in defense counsel's decision against testifying. *Id*. at 657. The waiver need not occur on the record. *Id*. Additionally, although constitutional in nature, a defect with respect to the right to testify has been deemed a nonstructural error, such that it is subject to harmless-error review. *Id*.

In *People v Boyd*, 470 Mich 363, 373-374; 682 NW2d 459 (2004), the Michigan Supreme Court addressed the issue whether a trial court's pretrial ruling allowing the prosecution to present

evidence that the defendant exercised his *Miranda*[6] right to remain silent to be admitted at trial effectively prevented the defendant from testifying at trial. The Court recognized the constitutional implications when a trial court's ruling, even on an evidentiary issue, effectively prevents the defendant from testifying at trial. *Id*. Nevertheless, the Court held that, because the admissibility of the defendant's post-*Miranda* silence would have depended on the context in which the prosecution sought to admit it, the defendant's claim of error was speculative in nature. *Id*. at 376. In other words, because the defendant did not testify, it was not clear whether the trial court would have ruled that the statement was inadmissible or whether the prosecution would have even sought to admit the statement. *Id*. The Court refused to speculate on whether the statement would have been properly admissible or regarding whether any error would have been harmless. *Id*. at 377. Thus, to present the challenge to the ruling in limine, the defendant had to testify at trial. *Id*. at 378.

This case presents a similar scenario. Defendant does not dispute that he waived his right to testify on the record. The following waiver colloquy occurred on the record:

> [*Defense Counsel*]: Mr. Harding, this is the date and time set for a trial and we have been in trial and this is the third day, correct?
>
> *Defendant Harding*: Correct.
>
> [*Defense Counsel*]: And you have an absolute right to testify in your trial, do you understand that?
>
> *Defendant Harding*: Absolutely.
>
> [*Defense Counsel*]: And you also have a right not to testify in your trial, do you understand that?
>
> *Defendant Harding*: Yes.
>
> *The Court*: And if you should testify, all that you might say on the stand is used by the jury in their determination of the facts of this case, correct?
>
> *Defendant Harding*: Correct.
>
> [*Defense Counsel*]: And if you choose not to testify, no juror can draw any conclusion as to your guilt. Do you understand that?
>
> *Defendant Harding*: Yes.
>
> [*Defense Counsel*]: Now there are three things that you have told me that I'll make part of this record, one of which was that somewhere on the record of this

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Court the statement was made that you have a right to correct your medical records, correct?

> *Defendant Harding*:  Mental health.

> [*Defense Counsel*]:  Mental Health.

* * *

> [*Defense Counsel*]:  Right?

> *Defendant Harding*:  Right.

> [*Defense Counsel*]:  And you also said to me that you had a right to correct the statements made by the interviews [sic] done for the forensic evaluations because they were based on hearsay, correct?

> *Defendant Harding*:  Correct.

> [*Defense Counsel*]:  And you are making that statement today as part of this record, correct?

> *Defendant Harding*:  Absolutely correct.

> [*Defense Counsel*]:  Okay.  And you also stated that there was some mental health records that had to be corrected.  Is that the statement?

> *Defendant Harding*:  Yes, that's the statement.

> [*Defense Counsel*]:  And you understand that the Judge's ruling is that the mental health condition or anything referenced to mental health would not be admissible, correct?

> *Defendant Harding*:  Correct.

> [*Defense Counsel*]:  And knowing all those things, you are choosing not to testify.  Is that a correct statement?

> *Defendant Harding*:  That's a correct statement.

The court then indicated it was satisfied with the waiver, and defense counsel agreed.

Defendant argues the trial court should not have prevented him from testifying about his mental-health condition, which he argues had a chilling effect on his ability to tell his side of the story.  Defendant relies primarily on the United States Supreme Court's opinion in *Rock v Arkansas*, 483 US 44, 56; 107 S Ct 2704; 97 L Ed 2d 37 (1987), which involved a state rule prohibiting posthypnotic testimony.  In that case, the United States Supreme Court concluded that the per se rule was unconstitutional and significantly adversely affected the petitioner's ability to

-14-

testify, explaining that a state may not "apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." *Id*. at 55-57.

Again, for the reasons stated above, the trial court did not err by precluding admission of evidence about defendant's mental-health condition and the related guardianship. Unlike in *Rock*, this case does not involve a per se rule that prohibited defendant from describing any of the events that occurred in this case. See *id*. at 57. Rather, this case involves an evidentiary ruling specific to the facts of this case, i.e., that he was not permitted under the pertinent law to present a potential NGRI defense, which was appropriate under the circumstances. Defendant cites no caselaw to support that an evidentiary ruling in a specific case may amount to a deprivation of the right to testify. Because Michigan does not recognize any lesser forms of mental-illness defenses, defendant's testimony about his mental health was not admissible for any other purpose. For these reasons, this basis for defendant's claim that his waiver was involuntary lacks merit.

Additionally, as in *Boyd*, defendant's argument about the effect of the trial court's ruling on his ability to testify is speculative in nature considering that defendant never testified at trial, and the record does not specify that the sole basis for this decision was defendant's inability to discuss his mental-health history. Although the issue of his mental health was raised during the waiver colloquy, defendant did not state that the court's evidentiary ruling was the sole basis for his decision against testifying. Also, because defendant never testified at trial, the court could not make contemporaneous rulings on the admissibility of his testimony. As for the remand request, defendant has not provided any legal authority that would allow him to develop a record on the subject after the fact through an evidentiary hearing in the trial court. The *Boyd* Court precluded this type of hindsight analysis. See *Boyd*, 470 Mich at 376-378.

Moreover, defendant has not established that the trial court's ruling precluded the testimony on subjects other than defendant's mental health. The other subjects defendant represents on appeal that he would have discussed during his testimony were (1) that his guardian (George Heitmanis) pressured JH to report the incidents to the police, (2) that the prior CSC-II conviction was not relevant, (3) that JH entered into a relationship with a man named David to convince herself she did not want a relationship with defendant, and (4) that JH was a "drug addict," and therefore had a motivation to lie. The court's mental-health ruling did not preclude defendant from testifying about these subjects, assuming the testimony was otherwise admissible under the Michigan Rules of Evidence. In fact, defense counsel explored the issue of the delay in JH's reporting of the incidents during cross-examination. Defendant did not explore the topic of an alleged drug addiction during JH's testimony, and does not explain on appeal how his potential testimony on that issue would bear on her credibility, especially considering the fact that JH admitted at trial that she had consumed alcohol and other substances, such as Ambien, at certain points during her sexual encounters with defendant. For these reasons, the court's evidentiary ruling did not amount to a deprivation of defendant's right to testify.

Finally, defendant argues that the trial court's frequent strictures and warnings about defendant's disruptive behavior also disincentivized him from testifying at trial. However, a trial court has the discretion to exclude a defendant from the courtroom during trial when the defendant's disruptive conduct amounts to a forfeiture of the right to be present in the courtroom. *People v Kammeraad*, 307 Mich App 98, 116-118; 858 NW2d 490 (2014). The record in this case

-15-

supports that defendant interrupted the court on numerous occasions, resulting in a brief removals from the courtroom. No constitutional deprivation occurred.

Additionally, any alleged constitutional error was harmless beyond a reasonable doubt. See *People v Solomon*, 220 Mich App 527, 534-538; 560 NW2d 651 (1996). In his written statement, defendant does not indicate that he would have denied that any of the incidents occurred. In fact, he suggests that he would have developed a theory through his testimony that JH was a willing participant in their relationship. Consent is not an element of CSC-III, and a defendant may be found guilty of the crime regardless of whether the other party consented to the sexual intercourse. See MCL 750.520d(1)(d). Defendant would have been subject to cross-examination on whether the incidents occurred. He does not dispute he would have acknowledged JH was his daughter and that they engaged in prohibited sexual acts, which are the elements of the crime. See *id*. For these reasons, any error was harmless beyond a reasonable doubt.

In his Standard 4 brief, defendant argues defense counsel was ineffective for failing to advise him about the law relating to his right to testify. We note defendant does not appear to have raised the issue by filing a motion for a new trial or *Ginther* hearing in the trial court, and it is not raised in either motion to remand in this Court. See *Abcumby-Blair*, 335 Mich App at 227; *Heft*, 299 Mich App at 80. We therefore deem it unpreserved. To the extent defendant argues that trial counsel told him the jury would "hang" him if he testified, this advice falls within the broad presumption that counsel's advice was a matter of sound trial strategy, particularly considering that (a) the court ruled that defendant could not discuss his mental health at trial, and (b) defendant does not deny that he engaged in the sexual activities with JH. See *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Consequently, defendant's claim of ineffective assistance lacks merit.

## IV. ANOTHER COMPETENCY EXAMINATION

Defendant next argues that the trial court erred by failing to sua sponte order another competency examination after defendant made statements on the first day of trial suggesting he may not be competent. He adds that counsel was ineffective for failing to raise the issue. In his Standard 4 brief, defendant further argues that the trial court compounded the error by failing to recognize certain inaccuracies in the reports concerning his earlier competency examinations. We disagree.

A defendant preserves the issue whether he is competent to stand trial by moving the trial court for a "new trial and evidentiary hearing." *People v Abraham*, 256 Mich App 265, 283; 662 NW2d 836 (2003). The issue of defendant's competency was thoroughly explored at trial, yet defendant did not move the trial court for a new trial or evidentiary hearing on the subject following the trial, opting instead to move this Court to remand the case for a new trial. Therefore, the issue is unpreserved. See *id*.

Defendant also did not preserve the issue of any errors in the forensic reports at trial. In general, an issue is preserved for appellate review if it is raised in, or addressed or decided by, the trial court. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020). Defendant did not raise this issue, and it was not addressed or decided. Therefore, it is unpreserved.

As noted earlier, a defendant preserves the issue of ineffective assistance of counsel by moving the trial court for a new trial or a *Ginther* hearing, *Heft*, 299 Mich App at 80, or by moving this Court to remand the case for a *Ginther* hearing, *Abcumby-Blair*, 335 Mich App at 227. Defendant preserved the issue relating to whether counsel was ineffective for failing to request another competency evaluation on the first day of trial when he raised it in his motion to remand the case for an evidentiary hearing on the issue of counsel's ineffective assistance, and requested that this Court remand the case for a *Ginther* hearing should this Court find it necessary to further supplemental the record on the issue of ineffective assistance. See *id*. However, defendant did not raise in the motion to remand any allegations related to errors in the forensic evaluations. Therefore, this particular ineffective-assistance issue is unpreserved. See *id*.

The trial court's decision on whether there is a "bona fide doubt" about the defendant's competence is generally reviewed for an abuse of discretion. *Kammeraad*, 307 Mich App at 138. However, because the issue is unpreserved, we review it for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763. Similarly, we review defendant's argument about the alleged errors in the forensic evaluations for plain error. *Id*.

A. BONA FIDE DOUBT AS TO DEFENDANT'S COMPETENCY

A defendant has a due-process right to be protected from trial or conviction while he is incompetent to stand trial. *Kammeraad*, 307 Mich App at 137. The issue is governed by both statute and court rule. *Id*. The relevant statute provides as follows:

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial. [MCL 330.2020(1).]

MCL 330.2022(1) adds, "A defendant who is determined incompetent to stand trial shall not be proceeded against while he is incompetent." Additionally, MCR 6.125(B) allows the issue of the defendant's competence to stand trial to be raised by the trial court or by motion of a party. See also MCL 330.2024 ("The issue of incompetence to stand trial may be raised by the defense, court, or prosecution. The time and form of the procedure for raising the issue shall be provided by court rule."). As for the trial court's responsibility to ensure the defendant is competent to stand trial, this Court has explained:

> Although the determination of a defendant's competence is within the trial court's discretion, a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a "bona fide doubt" as to the defendant's competence. However, the decision as to the existence of a "bona fide doubt" will only be reversed where there is an abuse of discretion. [*Kammeraad*, 307 Mich App at 138 (quotation marks and citation omitted).]

To determine whether a "bona fide doubt" exists, this Court will examine " 'whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.' " *Id*. at 138-139 (citation omitted). Relevant to this inquiry are the defendant's irrational behavior, his demeanor, and his prior medical records relating to competence. *Id*. at 139. " 'There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Id*. (citation omitted). On this issue, we give regard to the trial judge's ability to judge the credibility of the witnesses. See MCR 2.613(C).

Defendant compares this case to *People v Harris*, 185 Mich App 100, 102-103; 460 NW2d 239 (1990), in which the defendant had a long history of severe mental illness, including schizophrenia. The defendant was initially determined to be incompetent to stand trial about a year before the trial occurred, but two months later she was found competent to stand trial. *Id*. at 103. When the trial began, the defendant stated that she felt incompetent to stand trial and requested a court order for hospitalization. *Id*. The trial court found that the defendant "seemed to be 'getting along pretty good,' " and defense counsel indicated the defendant's mental-health condition was " 'not a factor in this particular case.' " *Id*. at 103. On appeal, this Court observed that the defendant made numerous bizarre statements and exhibited strange behaviors throughout the proceedings. *Id*. The case was remanded to allow the defendant to move for a new trial, and during the corresponding evidentiary hearing, a psychologist testified that the defendant's delusions would continue even with effective medication. *Id*. He opined it was "highly unlikely" the defendant was competent at the time of trial and that had her competence been evaluated, she would have been found not competent to stand trial. *Id*. Nevertheless, the trial court denied the defendant's motion for a *nunc pro tunc* competence hearing, and the case returned to this Court. *Id*. This Court held that the evidence supported that there was at least a bona fide doubt about the defendant's competence, and the trial court erred by failing to order a reevaluation before trial. *Id*. This Court held that defense counsel's conduct was ineffective for failing to question the psychologist who initially found the defendant competent to stand trial, and failing to request a reevaluation. *Id*. at 103-104.

The trial court's decision in the present case must be considered in context. At trial, defendant made strange statements including that he believed he was "being attacked by an electric magnetic weapon" and that he had "a microchip under [his] fingernail." He later stated that the jail contained a virus that was consuming the documents in the facility, causing the paper to "dawn[] a mouth" and attack him. In a different context, these statements may have raised a "bona fide doubt" about defendant's competence. *Kammeraad*, 307 Mich App at 138. However, by that time defendant had already undergone three competency examinations and been consistently found competent to stand trial. The examiners found that defendant not only had a good grasp of the legal proceedings, but also appeared to be fabricating or bolstering his mental-health symptoms to appear incompetent to stand trial.

Specifically, Dr. Gilbert found that defendant researched the topic of legal insanity, and the mental-health staff at the jail believed he was feigning his symptoms. Dr. Gilbert concluded defendant did not exhibit psychotic qualities, and that while his behavior was at times bizarre and paranoid, he appeared to be attempting to present himself that way "in a disingenuous manner." He "appeared motivated to present himself as psychiatrically impaired and, in his own words and

characterization, incompetent to stand trial." Defendant was able to understand the charges in the case, could present coherent information about the incidents, and appeared to understand more generally the legal consequences of a conviction. Dr. Gilbert concluded, "[I]t seemed evident that he wanted to be deemed incompetent to stand trial, and that he was motivated to come across as psychiatrically impaired."

When the issue arose during the pretrial proceedings, defendant was independently evaluated. Unlike the evaluation in *Harris*, the independent evaluation occurred only about a month before trial. Dr. Abramsky noted that during the examination, defendant "was perfectly coherent with no signs of significant mental health problems." Dr. Abramsky explained that defendant's mental-health records contained contradictory information and diagnoses. Dr. Abramsky concluded that defendant qualified for a dual diagnosis of manic-depressive disorder and antisocial personality disorder. But he did not find that defendant had schizophrenia or any other mental illness that would render him incompetent to stand trial. So, he found defendant both competent to stand trial and to be found criminally responsible. Also, unlike *Harris*, where the defendant was initially determined to be incompetent to stand trial, no such determination was ever made in this case.

Under these circumstances, the trial court did not commit an error or deprive defendant of his due-process rights by ruling that defendant's competency had been thoroughly explored before trial. The statements defendant made on the record were consistent with those he had made before and during his previous competency examinations. And unlike *Harris*, defendant has not proposed any testimony from any expert willing to opine that defendant was not competent to stand trial.

Defendant also indicated during trial that he believed he did not "have the wherewithal to withstand the emotional pressure of the trial." But defendant's emotional ability to withstand the trial was not an indication he was incompetent to stand trial. In other words, considering the findings of the two examiners, a reasonable judge sitting in the trial court's position would not have experienced doubt about defendant's competency. See *Abraham*, 256 Mich App at 283-284. For the same reasons, defendant also cannot demonstrate prejudice. There is no indication that defendant was actually innocent of the crimes, and any error in discretion exercised by the trial court does not appear to have seriously affected the fairness, integrity, or public reputation of the judicial proceedings. See *Carines*, 460 Mich at 763.

We further decline to remand this case on this issue. In his offer of proof, defendant asks for the opportunity to expand the record to include portions of his mental-health records from 2004; however, as discussed previously, those records do not have any bearing on his ability to stand trial nearly 20 years later. As also discussed previously, the guardianship proceedings are different in nature than the competency and NGRI aspects of the criminal case, and defendant cites no legal basis for finding him incompetent just because he had a guardian appointed in an earlier probate-court matter. Thus, remand is unwarranted. See MCR 7.211(C)(1)(a).

## B. INEFFECTIVE ASSISTANCE

Likewise, we do not conclude that trial counsel was ineffective for failing to request another competency examination considering that defendant was evaluated in the month before trial, and his behavior was similar to the conduct two previous evaluators found disingenuous.

Counsel is not ineffective for failing to advance a meritless argument. See *Ericksen*, 288 Mich App at 201. Further, unlike *Harris*, defense counsel in this case previously requested an independent competency examination that concluded defendant was competent to stand trial. Under these circumstances, defendant has not overcome the strong presumption that counsel's decision was sound trial strategy. See *Matuszak*, 263 Mich App at 58. Additionally, because the argument would have been meritless, remand is not warranted to permit trial counsel to testify on this issue.

## C. ERRORS IN FORENSIC REPORTS

In his Standard 4 brief, defendant maintains that the trial court abused its discretion by considering the forensic evaluations as evidence of his competency to stand trial (and to support a lack of evidence of an NGRI defense) because they contained various errors. However, defendant does not articulate any errors requiring reversal.

Defendant suggests that the CFP report contained an error about whether he had an intellectual disability. He argues Dr. Gilbert did not perform any evaluations in relation to his intellectual ability and that he was "developmentally retarded and intellectually disabled in social functioning." Defendant cites a medical record from 2020 to support that he had an intellectual disability and suffered from "social-sexual rejection," causing him to seek sexual contact with his own daughter. But that record was not admitted at trial. He also suggests, more broadly, that JH's love for him drove him insane. Defendant argues Dr. Gilbert stated that defendant said the sexual relationship was "voluntary," but argues he actually said the relationship was "consensual" considering he did not commit the acts voluntarily. He also argues more broadly that Dr. Gilbert overlooked that he had an "irresistible impulse" to have sexual intercourse with his daughter. He also denies telling Dr. Gilbert that he and JH had a "contract" for sexual activities or that he was afraid of being arrested. He argues the MDOC was biased against him, which affected the conclusions in the evaluations. Defendant continues to maintain he has schizophrenia and refutes Dr. Gilbert's conclusion that he " 'appeared exaggerated, dramatic[,] and manufactured' " in his efforts. He maintains that all the evaluators were biased against him.

Defendant fails to show that any of the statements were false. He fails to explain how the distinction between a "voluntary" relationship and a "consensual" relationship alters the outcome of this case. His argument that he lacked the mental capacity to consent to the relationship is undermined by the arguments he makes in other parts of his Standard 4 brief in which he argues the parties had a consensual relationship. And there is no record evidence to support an intellectual-disability defense, or that the CFP report contained any errors. The 2020 medical report defendant cites does not appear in the record. In summary, defendant has not presented evidence of any errors in the evaluations that would have affected the NGRI defense, or that correct evaluations would have altered the court's finding on the NGRI defense. No plain error occurred.[7]

---

[7] Defendant also suggests in his Standard 4 brief that the trial court erred, and counsel rendered ineffective assistance, because defendant never received a copy of Dr. Abramsky's report. Defendant does not support his argument that he never received the report. He also claims Dr.

Counsel also did not render ineffective assistance by failing to raise this issue because any argument on this point would have been meritless. See *Ericksen*, 288 Mich App at 201.

## V. STANDARD 4 BRIEF

Defendant also raises a series of arguments in his Standard 4 brief that we will discuss next, none of which have merit. For most of the claims raised in the Standard 4 brief, defendant raises alternative, unpreserved claims of ineffective assistance of counsel, which we will discuss separately.

## A. CONSENT DEFENSE

First, Defendant argues in his Standard 4 brief that he should not have been convicted of CSC-III because JH consented to the sexual acts in question and the two had a "spiritual marriage." We disagree.

We consider defendant's argument to be best characterized as one challenging the sufficiency of the evidence supporting his conviction.[8] We review de novo a challenge to the sufficiency of the evidence to support a conviction. *People v Speed*, 331 Mich App 328, 331; 952 NW2d 550 (2020). "In examining the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Id.* (quotation marks and citation omitted). This Court must resolve all conflicts in the evidence in favor of the prosecution. *People v Smith*, 336 Mich App 297, 303; 970 NW2d 450 (2021). We review de novo issues of statutory interpretation. *People v Lechleitner*, 291 Mich App 56, 59; 804 NW2d 345 (2010). The goal of statutory interpretation "is to ascertain and give effect to the intent of the Legislature. The touchstone of legislative intent is the statute's language." *People v Harris*, 495 Mich 120, 126-127; 845 NW2d 477 (2014) (quotation marks and citation omitted). When the language of the statute is clear and unambiguous, we enforce the plain meaning of the statute as written. *Id.* at 127.[9]

The applicable statute provides, in relevant part, as follows:

---

Abramsky was not paying attention during the evaluation and appeared to be on drugs, but again cites no record evidence to support these allegations.

[8] Arguably, defendant's argument could be considered an argument that the court erred by failing to allow him to raise a consent defense. However, regardless of how the issue is characterized, as discussed later, consent is not a defense to CSC-III on an incest theory.

[9] Defendant relies, to a large extent, on a police report that does not appear in the lower court file and was not admitted into evidence at defendant's trial. We decline to consider that document as doing so would constitute an improper expansion of the record on appeal. See *People v Morrison*, 328 Mich App 647, 655; 939 NW2d 728 (2019).

A person is guilty of criminal sexual conduct in the third degree if the person engages in sexual penetration with another person and if any of the following circumstances exist:

* * *

(d) That other person is related to the actor by blood or affinity to the third degree and the sexual penetration occurs under circumstances not otherwise prohibited by this chapter. It is an affirmative defense to a prosecution under this subdivision that the other person was in a position of authority over the defendant and used this authority to coerce the defendant to violate this subdivision. The defendant has the burden of proving this defense by a preponderance of the evidence. This subdivision does not apply if both persons are lawfully married to each other at the time of the alleged violation. [MCL 750.520d(1)(d).]

Here, there is no dispute that (a) defendant and JH engaged in sexual penetration on at least five occasions, (b) JH and defendant were father and daughter, and (c) JH was not in a position of authority over defendant. Additionally, although defendant argues that he and JH had a "spiritual marriage," there was no evidence presented at trial that the marriage was a lawful marriage recognized under the law of the state of Michigan.[10] See MCL 551.3 (prohibiting a man from marrying his own daughter). Nor is consent alone enough to establish a legal marriage in Michigan—a license and solemnization are also required. See MCL 551.2.

Defendant's arguments in his Standard 4 brief are that (1) the incidents did not involve forcible rape, (2) JH consented to the sexual acts, and (3) JH was not "a victim" as that term is defined for purposes of the criminal sexual conduct statutes. Regarding the issue of forcible rape, MCL 750.502d(1)(d) does not require the prosecution to establish that a defendant used force or threat of force to commit the sexual acts. In fact, other provisions of the criminal sexual conduct statutes expressly refer to acts of "[f]orce or coercion," demonstrating that Legislature knew how to impose such a requirement if it intended to do so. See, e.g., MCL 750.520d(1)(b), MCL 750.520c(1)(d), MCL 750.520b(1)(d).

Regarding the definition of "victim," MCL 750.520a(s) defines the term as "the person alleging to have been subjected to criminal sexual conduct." Defendant maintains JH was not "subjected to" criminal sexual conduct. However, MCL 750.520d(1)(d) does not indicate that a "victim" must be involved in the crime of incest or even mention that term. Rather it refers to the "actor" and the "other person." See MCL 750.520d(1)(d). Considering that other subdivisions

---

[10] Defendant relies on several statements he maintains are found within a document entitled United Nations, *Universal Declaration on Human Rights* (UDHR) (1948), for the general principle that individuals have a freedom to marry and freedom of religion. He also refers to another United Nations document. We note the United States Supreme Court has concluded that the UDHR "does not of its own force impose obligations as a matter of international law." *Sosa v Alvarez-Machain*, 542 US 692, 734; 124 S Ct 2739; 159 L Ed 2d 718 (2004). Defendant provides no legal basis for finding these documents binding on this Court.

within the same section refer to a "victim," the change in terminology demonstrated an intent to not require a victim as defined in MCL 750.520a(s). See *People v Vaughn*, 344 Mich App 539, 565; 1 NW3d 414 (2022) ("When the Legislature uses different words, the words are generally intended to connote different meanings." (quotation marks and citation omitted)). On the issue of consent, MCL 750.520d(1)(d) does not contain a requirement that the prosecution establish a lack of consent, and the statute also does not indicate consent is an affirmative defense.

As detailed above, the evidence supported that defendant engaged in sexual penetration with JH, who was related to him by blood within the third degree, and that the penetration occurred under circumstances not otherwise prohibited by the law. Further, defendant presented no evidence demonstrating that he and JH were legally married. For these reasons, we find that sufficient evidence supported defendant's CSC-III convictions.

## B. CONSTITUTIONAL CONSIDERATIONS

Defendant next argues he had a constitutional right to marry JH based on principles of religious freedom, due process, and equal protection. We disagree.

We review de novo a challenge to the constitutionality of a statute. *People v Boomer*, 250 Mich App 534, 538; 655 NW2d 255 (2002). A statute is presumed to be constitutional unless the unconstitutionality of the statute is " 'clearly apparent.' " *Solloway*, 316 Mich App at 184 (citation omitted). " 'A constitutional challenge to the validity of a statute can be brought in one of two ways: by either a facial challenge or an as-applied challenge.' " *People v Johnson*, 336 Mich App 688, 692; 971 NW2d 692 (2021) (citation omitted). A facial challenge is one to the statute itself, in which the defendant must establish that there are no circumstances under which the statute would be valid. *Id*. In contrast, an as-applied challenge relates to the denial of a specific right or an injury that is particular in the process of the actual execution of the government's actions. *Id*. In other words, this Court examines "the specific application of a facially valid law to individual facts." *People v Jarrell*, 344 Mich App 464, 482; 1 NW3d 359 (2022) (quotation marks and citation omitted), application for lv held in abeyance 994 NW2d 778 (Mich, 2023), application for lv held in abeyance 12 NW3d 396 (Mich, 2024). See also *Bonner v Brighton*, 495 Mich 209, 223 n 27; 848 NW2d 380 (2014) (an as-applied challenge is "a present infringement or denial of a specific right or of a particular injury in process of actual execution of government action." (quotation marks and citation omitted)).

Although defendant does not specify whether his challenge is facial or as-applied to his situation, he does not claim that there are no circumstances under which the CSC-III statute would be valid. Rather, he argues that, under the facts of this case, because defendant had a "spiritual marriage" to JH, his CSC-III convictions deprived him of his constitutional rights. Therefore, his challenge is an "as-applied" challenge.

Beginning with defendant's freedom-of-religion argument, defendant presents challenges under both the United States Constitution and Michigan's 1963 Constitution. The First Amendment to the United States Constitution provides, in relevant part, "Congress shall make no law . . . prohibiting the free exercise" of religion. US Const, Am I. The Tenth Amendment to the United States Constitution, which defendant also cites in his Standard 4 brief, provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States,

are reserved to the States respectively, or to the people." US Const, Am X. The Fourteenth Amendment to the United States Constitution applies the First Amendment to the states. See US Const, Am IV; *People v DeJonge*, 442 Mich 266, 273; 501 NW2d 127 (1993).

Regarding freedom of religion, Michigan's 1963 Constitution provides, in relevant part:

> Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief. [Const 1963, art 1, § 4.]

Additionally, Const 1963, art 8, § 1, provides, "Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."[11] The right to marry is a fundamental due-process and equal-protection right. *Pueblo v Haas*, 511 Mich 345, 361; 999 NW2d 433 (2023).

The CSC-III statute is not unconstitutional as applied to defendant's CSC-III convictions. To start, defendant does not present any evidence that he had any form of marriage (spiritual or otherwise) with JH. In fact, in his Standard 4 brief, defendant baselessly alleges that JH consented to their alleged spiritual marriage by confirming she wanted to have sexual intercourse with him and asking him not to leave her. He acknowledges she was drinking at the time, which impaired her memory. Defendant does not argue that he and JH were married under the laws of the state of Michigan. See MCL 750.520d(1)(d) ("This subdivision does not apply if both persons are lawfully married to each other at the time of the alleged violation.").

Even if this Court were to entertain defendant's completely unfounded argument that he and JH had some form of "spiritual marriage" under his religion, defendant's freedom-of-religion right would give way to the state's interest in preventing incest. Michigan has criminalized incest and prohibited marriage between closely related individuals since the early days of this state's existence. See *People v Jenness*, 5 Mich 305, 307 (1858). When it comes to whether a statute infringes on the constitutional protection of the free exercise of religion, the general rule is that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc v City of Hialeah*, 508 US 520, 531; 113 S Ct 2217; 124 L Ed 2d 472 (1993). "A law failing to satisfy these requirements must be justified by a compelling

---

[11] Defendant also relies on Const 1963, art 1, § 25, which was a provision defining the term "marriage" as a union of one man and one woman. However, the United States Supreme Court held that constitutional provision violated the United States Constitution. *Obergefell v Hodges*, 576 US 644, 680-681; 135 S Ct 2584; 192 L Ed 2d 609 (2015).

governmental interest and must be narrowly tailored to advance that interest," i.e., must overcome a strict-scrutiny review. *Id*. at 531-532.

MCL 750.520d(1)(d) does not lack facial neutrality, does not burden any particular religion, and therefore does not need to be justified by a compelling governmental interest. See *id*. Nor is there any evidence in the record that the real purpose of the incest provision of MCL 750.520d was to prohibit the practice of defendant's religion (Messianic Yahwism). Nor does defendant provide evidence to support that "spiritual marriage" is a major tenant of his religion (or even that his religion would sanction the marriage between defendant and his daughter). Rather, the purpose of the CSC-III statute, based on its language, is to prohibit sexual contact between closely-related individuals, regardless of their religious affiliations. See *id*.

The United States Supreme Court has rejected the notion that an individual can make a sweeping challenge to a criminal law on the basis of a religious objection. See *Employment Div, Dep't of Human Resources of Oregon v Smith*, 494 US 872, 878-879; 110 S Ct 1595; 108 L Ed 2d 876 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."), superseded in part by statute on other grounds as stated in *Ramirez v Collier*, 595 US 411, 424-425; 142 S Ct 1264; 212 L Ed 2d 262 (2022). The United States Supreme Court explained: "Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation. We have never held that, and decline to do so now." *Smith*, 494 US at 882. In other words, without evidence that the Legislature intended to target his religion when it enacted the CSC-III statute pertaining to incest, defendant cannot make a sweeping religious challenge to the statute.

Defendant's due-process and equal-protection challenges also lack merit. For equal protection, under both the United States Constitution and Michigan's 1963 Constitution, "equal protection requires that persons be treated alike with respect to certain, largely innate, characteristics that do not justify disparate treatment." *People v James*, 326 Mich App 98, 105; 931 NW2d 50 (2018) (quotation marks and citation omitted).[12] Again, defendant's constitutional challenges are best characterized as "as-applied" challenges. "To prevail on the claim, defendant must show both that (1) he has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment." *Id*. at 106 (quotation marks and citation omitted).

Defendant is similarly situated to an identified group if he can show that "he is comparable in all material respects to the members of that group." See *id*. In this case, defendant does not identify a group to which he is similarly situated, and he does not show he was intentionally treated

---

[12] In his Standard 4 brief, defendant indicates the trial court erred by failing to apply the Civil Rights Act (CRA), MCL 37.2101 *et seq*., to his case. However, the CRA is a civil statutory scheme that is not applicable in criminal cases. See MCL 37.2101 (explaining that the statutory scheme relates to employment, housing, real estate, public accommodations, public services, and education facilities).

differently from other similarly situated individuals. His argument is limited to the idea that the law discriminates against unmarried individuals. He also suggests he was treated differently than JH, possibly attempting to raise a gender-based argument. Again, the CSC-III statute does not single out defendant's religion in any way. It does not treat individuals differently because of gender. Therefore, defendant's equal-protection claim lacks merit. Although the law provides an exception for lawful marriage, there is a rational basis for the difference in treatment between lawfully married individuals and other individuals. Specifically, a rational basis for the difference in treatment existed considering Michigan's longstanding prohibition on incest and marriage between a father and a daughter. It was rational for the Legislature to distinguish between those individuals with marriages recognized under Michigan law and those individuals without lawfully recognized marriages.

Regarding his due-process challenge, because defendant does not raise any procedural irregularities, we assume his challenge is one of substantive due process. See *People v Konopka (On Remand)*, 309 Mich App 345, 366; 869 NW2d 651 (2015). Both the United States Constitution and the Michigan Constitution of 1963 prohibit the government from depriving individuals of life, liberty, or property without due process of the law. *Id*. "For a challenge to a statute on the grounds of a substantive due process violation, a challenger must show that the statute is unrelated to a legitimate government purpose and thus, essentially arbitrary." *Id*. at 366-367. Defendant does not explain in his Standard 4 brief how the provision of the CSC-III statute criminalizing incest is arbitrary or unrelated to a legitimate government purpose. The fact that the law incidentally affects a belief that defendant characterizes as religious in nature does not show the law was arbitrary. We decline to make a more specific argument for defendant. See *id*. at 366 ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue.").

## C. OTHER-ACTS EVIDENCE

Defendant next argues the prosecutor and trial court erred and conspired with each other to improperly admit evidence of defendant's prior CSC-II conviction because this case did not involve domestic violence or sexual assault, and his prior conviction was very old. Again, we disagree.

The overarching issue of the admissibility of this evidence was raised through the prosecution's notice of intent to introduce other-acts evidence at trial and defendant also raised the specific objection regarding the age of his prior conviction by objecting and raising this same basis as the reason for the objection. Therefore, this issue is preserved for appellate review. See *Aldrich*, 246 Mich App at 113. However, as defendant acknowledges in his Standard 4 brief, there was no specific challenge to the admission of evidence relating to defendant's CSC-II conviction on the basis that this case was not a sexual assault or rape case. Therefore, that issue will be reviewed for plain error. See *Carines*, 460 Mich at 763.

Again, we review evidentiary issues for an abuse of discretion, *Aldrich*, 246 Mich App at 113, and preliminary questions of law de novo, *Galloway*, 335 Mich App at 637. We review defendant's unpreserved evidentiary challenge for plain error. See *Carines*, 460 Mich at 763.

Propensity evidence is generally inadmissible. See MRE 404. Under MRE 404(b), the general rule is that evidence of other crimes, wrongs, or acts cannot be admitted at trial to establish a propensity to commit those acts. *Galloway*, 335 Mich App at 637-638. However, the trial court in this case relied upon MCL 768.27b(1), which at the time of trial was broader than MRE 404(b) in cases involving sexual assault or domestic violence, and even permitted relevant evidence of other domestic-violence or sexual-assault incidents to prove any issue, even the character of the accused, provided that evidence meets the standard outlined in MRE 403. See *People v Cameron*, 291 Mich App 599, 609; 806 NW2d 371 (2011), and MCL 768.27b(2), as amended by 2018 PA 372. This statute permitted the jury the opportunity to weigh the defendant's history and view the facts of the case in the larger context. *Id*.

Here, the CSC-II conviction arose from an act occurring more than 10 years before the charged offenses. On this issue, MCL 768.27b(4) at all relevant times provided as follows:

> Evidence of an act occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that 1 or more of the following apply:

> (a) The act was a sexual assault that was reported to law enforcement within 5 years of the date of the sexual assault.

> (b) The act was a sexual assault and a sexual assault evidence kit was collected.

> (c) The act was a sexual assault and the testing of evidence connected to the assault resulted in a DNA identification profile that is associated with the defendant.

> (d) Admitting the evidence is in the interest of justice.

In his Standard 4 brief, defendant raises two challenges to the admission of the evidence relating to his prior CSC-II conviction (which included admission of documentation from the prior conviction and JH's testimony about the prior acts). First, defendant argues that the evidence should not have been admitted because this case did not involve a "sexual assault." Second, defendant maintains the conviction, which was over 25 years old, was not relevant for purposes of this trial and, even if it were, the probative value was substantially outweighed by the danger of unfair prejudice.

Starting with the first issue, MCL 768.27b(6)(c) defines the term "sexual assault" as "a listed offense as that term is defined in section 2 of [the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*.], MCL 28.722." The question is whether this CSC-III case on an incest theory constituted a sexual assault under SORA. MCL 28.722(i) provides, in relevant part, that a listed offense is a Tier I, Tier II, or Tier III offense. Relevant to this appeal, a Tier III offense includes, in relevant part, a violation of MCL 750.520d. See MCL 28.722(v)(*iv*). The only exception occurs when "the court determines that the victim consented to the conduct constituting the violation, that the victim was at least 13 years of age but less than 16 years of age at the time of the offense, *and* that the individual is not more than 4 years older than the victim." *Id*. (emphasis added). There is no dispute JH was well over 16 years old at the time of the instant offenses, and that defendant

was considerably more than four years older than her. So, because the offenses at issue were Tier III offenses, they were listed offenses under SORA and were therefore considered "sexual assault" under MCL 768.27b. MCL 768.27b permitted the prosecution to admit the evidence of defendant's past behavior and CSC-II conviction.[13]

The next issue is whether the prior CSC-II conviction was relevant, for purposes of MRE 401 and 402, and whether the probative value was substantially outweighed by the danger of unfair prejudice under MRE 403. MRE 402 provides that irrelevant evidence is inadmissible at trial. MRE 401 explains that evidence is relevant if it tends to make a fact more or less probable than the fact would be without the evidence. MRE 403 adds that relevant evidence may nevertheless be excluded at trial when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. This Court has explained that there are two prongs to this inquiry. First, the court must determine whether the introduction of the prior acts would be unfairly prejudicial, and second, the court must weigh the probative value of the evidence against the danger of unfair prejudice. *Cameron*, 291 Mich App at 611.

The trial court in the present case found that the other-acts evidence relevant and that the danger of unfair prejudice did not substantially outweigh its probative value. In finding that the evidence was relevant, the trial court relied, in part, upon this Court's decision in *Cameron*, 291 Mich App at 610. In *Cameron*, the defendant was facing allegations of domestic violence arising out of an assault on his ex-girlfriend. There was evidence that the defendant had a pending domestic violence charge for a prior confrontation with his ex-girlfriend, as well as evidence of additional violent incidents between them and also between the defendant and another former love interest. *Id*. at 609-610. We agreed with the trial court's findings that the evidence was relevant to establish the credibility of the ex-girlfriend to show that he acted violently towards her, to show that his actions were not accidental, and to demonstrate the defendant's "propensity to commit acts of violence against women who were or had been romantically involved with him." *Id*. at 612. Further, we found that admission of the evidence did not violate MRE 403 because the trial court minimized the prejudicial effect of the bad-acts evidence by properly instructing the jury (that the issue in the case was whether the defendant committed the charged offense) and because any prejudicial effect of the trial court's decision to allow the prior bad-acts evidence did not substantially outweigh the probative value of the evidence. *Id*. at 611-612.

In the present case, we find that the court did not abuse its discretion when it found the prior acts to be relevant and material to the issues in the case, in order to provide context for defendant's conduct in light of his history with JH. See *Cameron*, 291 Mich App at 610. Also, as the trial court noted, "the evidence tends to show [d]efendant's propensity to victimize

---

[13] While defendant does not raise an express challenge on appeal to the fact that the conviction was more than 10 years old, there is no dispute the prior CSC-II offense was a sexual assault, or that it was reported within five years of the offense. So, the prior offense was admissible under MCL 768.27b(a).

[c]omplainant, regardless of her age," which was likewise consistent with *Cameron*. *Id*. at 610, 612.

Turning to the issue of MRE 403, evidence is considered unfairly prejudicial when it has a tendency "to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Pickens*, 446 Mich 298, 337; 521 NW2d 797 (1994) (quotation marks and citation omitted). On this issue, this Court has recently clarified that the propensity inference of MCL 768.27b evidence should weigh *in favor* of the probative value of evidence, rather than in favor of its prejudicial effect, as would normally be the case. *People v Berklund*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367568); slip op at 9-10. This Court noted a list of nonexhaustive factors that the trial court may apply in this context, including:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Id.* at ___; slip op at 10 (quotation marks and citation omitted).]

In *Berklund*, this Court upheld the trial court's finding that a 20-year-old conviction could be admitted at trial despite the application of MRE 403 because MCL 768.27b allowed older offenses to be admitted under certain circumstances. *Id*. at ___; slip op at 10-11.

In this case, we find that the trial court did not err by holding that the evidence did not violate MRE 403. As the court pointed out, defendant was convicted of CSC-II in relation to the prior acts. So the prejudicial effect of the evidence is minimized and was fair because defendant was found to have committed the earlier crime beyond a reasonable doubt. As noted earlier, any propensity inference from the evidence would actually weigh in favor of the probative value of the evidence. Nor was there any evidence that the prior CSC-II crimes would inject extraneous considerations into the lawsuit or divert the jury's attention from the issue of defendant's guilt or innocence. See *id*. at ___; slip op at 11 (noting these considerations for determining whether there existed unfair prejudice).[14] The trial court therefore did not err in balancing the danger of unfair prejudice against the probative value of the evidence for purposes of MRE 403. Also, just as in *Cameron*, 291 Mich App at 611-612, the trial court properly instructed the jury—the trial court read a limiting jury instruction pertaining to the other-acts evidence, explaining that the jury could not find defendant guilty for the sole reason that he was guilty of the other bad conduct. This instruction minimized the danger of unfair prejudice because jurors are presumed to follow their instructions. See *Berklund*, ___ Mich App at ___; slip op at 11.

---

[14] Defendant fails to support his claim that the jury was given the wrong date of defendant's CSC-II conviction or that this error would be material to the case.

Finally, turning to the issue of an alleged conspiracy, defendant cites no evidence in the record to support his claim of a conspiracy between the trial court and the prosecutor. Again, "[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims." *Payne*, 285 Mich App at 195. We therefore decline to search for a basis for defendant's conspiracy claim.

## D. SENTENCING

Next, defendant argues the trial court erred in the scoring of Offense Variables (OVs) 4, 10, and 13; in relation to the assaultive-risk screening sheet issued by the MDOC; by requiring defendant to pay restitution; and by issuing a no-contact order as part of defendant's sentence. We disagree.

A defendant preserves a sentencing issue on appeal, including a challenge to the assessment of points for an OV, by raising the issue during sentencing, in a motion for resentencing, or in a motion to remand in this Court. *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018); MCR 6.429(C). Before defendant's sentencing, defendant filed a sentencing memorandum in which he challenged the assessment of points for OVs 4 and 10, and raised a separate challenge to OV 13.

At sentencing, a new attorney represented defendant. Successor counsel did not reiterate the arguments in the sentencing memorandum and instead stated, "I have myself no challenges." This Court has held that indicating that there are no corrections to the presentencing investigation report (PSIR) constitutes a forfeiture of the issue, but not a waiver of the error. See *People v McChester*, 310 Mich App 354, 357; 873 NW2d 646 (2015). The court also permitted defendant to speak at length before he was sentenced, but defendant did not raise a challenge to any OVs. Defendant likewise did not move for resentencing in the trial court, and neither motion to remand raised an issue relating to defendant's sentencing. Therefore, the issue is unpreserved. See *Anderson*, 322 Mich App at 634. Additionally, defendant did not raise a challenge to the restitution, the no-contact order, or the assaultive-risk-screening sheet. Therefore, those issues are also unpreserved. See *id*.

In general, we review the trial court's findings regarding a specific OV under the sentencing guidelines for clear error, and a preponderance of the evidence must support the factual findings. *People v Baskerville*, 333 Mich App 276, 291; 963 NW2d 620 (2020). " 'Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.' " *Id*. at 292 (citation omitted). When a sentencing issue is unpreserved, as is the case here, this Court will review it for plain error affecting the defendant's substantial rights. *People v Meshell*, 265 Mich App 616, 638; 696 NW2d 754 (2005).

### 1. OV 4

OV 4 examines the psychological injury to the victim. *People v White*, 501 Mich 160, 163; 905 NW2d 228 (2017). MCL 777.34 governs OV 4 and provides, in relevant part, that the trial court must assess 10 points for OV 4 when there is "[s]erious psychological injury requiring professional treatment." MCL 777.34(1)(a). In contrast, the court should assess zero points when

"[n]o serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(c). The statute explains that the court must "[s]core 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." MCL 777.34(2). The Michigan Supreme Court has held that a victim's fear during the crime, without any other showing of a psychological injury, is not enough to assess 10 points for OV 4. See *White*, 501 Mich at 164. Relevant considerations may include, among other possible psychological effects, "personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *People v Armstrong*, 305 Mich App 230, 247; 851 NW2d 856 (2014). A trial court may not simply assume that someone in the victim's position would have suffered a psychological injury. *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012).

Based on the record before us, we find that there was sufficient evidence to support a finding, by a preponderance of the evidence, that JH experienced feelings of being hurt, unsafe, or violated as a result of defendant's conduct. In JH's impact statement in the PSIR, it is noted that JH indicated she was "doing 'ok' " since the incidents giving rise to this case, but she was "very hesitant to talk and it sounded that she was holding back tears as she was sniffling during the conversation." She did not want to speak about the incidents. Therefore, the interviewer did not continue asking questions "in order to prevent further traumatizing" JH, who indicated she did not plan to attend the sentencing. The fact that JH could not even speak about the incidents supports that she suffered a serious psychological injury. At trial, JH gave a more detailed story about the effect of the incidents on her psychological state. She testified that defendant assaulted her sexually when she was a young child. JH explained that she invited defendant to move in with her "[t]o have my dad back." She believed she was in love with defendant during this time but later came to realize she was not. She testified defendant's conduct made her feel "crazy." She also felt "ashamed" of what happened and felt "guilty." To further support and give context to JH's testimony, Dr. Henry testified about the phenomenon of a trauma bond, which occurs when there is harm in a relationship, and the relationship develops on the basis of fear and the requirement to meet the parent's need in order to survive. He explained that the trauma bond can result in romanticizing the parent-child relationship, which we conclude would explain JH's behavior while having sexual intercourse with defendant. When combined with JH's testimony, Dr. Henry's testimony supports a finding that JH suffered a serious psychological injury requiring professional treatment. For these reasons, the assessment of 10 points for OV 4 was supported by a preponderance of the evidence.

Finally, we note that even if defendant could prove error in the assessment of 10 points for OV 4, it would not be prejudicial considering that the subtraction of 10 points from defendant's OV score would not have altered the sentencing-guidelines range. See MCL 777.63; MCL 777.167 (designating CSC-III as a Class B crime against a person); *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006) ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required.").

### 2. OV 10

OV 10 examines the exploitation of a vulnerable victim. MCL 777.40. In relevant part, 10 points should be assessed when "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority

status." MCL 777.40(1)(b). MCL 777.40(2) adds, "The mere existence of 1 or more factors described in subsection (1) does not automatically equate with victim vulnerability." The term "exploit" is defined, in relevant part, as "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). The term "vulnerability" is defined as "the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c). Finally, the term "abuse of authority status" is defined as "a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher." MCL 777.40(3)(d).

Regarding OV 10, the PSIR stated, "10 points were scored for OV 10 as the offender exploited his father / daughter domestic relationship with his daughter / victim [JH] by forcing her to engage in sexual intercourse with him." Defendant argues that this statement was incorrect because it was "falsely alleged" that he exploited the father-daughter relationship. The evidence at trial supported, by a preponderance of the evidence, that defendant exploited his authority status to engage in the sexual activities with JH. To start, although the PSIR defined the parties' relationship as a "domestic relationship," MCL 777.40 does not define "domestic relationship." We conclude that even assuming that the father-daughter relationship did not constitute a domestic relationship, defendant was an authority figure, as defined in MCL 777.40(3)(d), because he was JH's parent.

The evidence also supported that defendant manipulated JH for his own selfish purposes beginning when she was six or seven years old and continuing into her adulthood after he was released from prison. JH testified that when she was about six or seven years old, defendant had sexual encounters with her. After she received communication with defendant in early 2019, JH testified that she was worried and a little afraid, but nevertheless decided to respond. The two met in person shortly thereafter, and JH noticed defendant had "a weird smell," and she did not think he was taking care of himself. She felt bad for defendant and wanted to take care of him. JH explained that she invited defendant to move in with her "[t]o have my dad back." She believed she was in love with defendant. She testified that after moving into the home, defendant became "very clingy" and jealous. She would have to rebuke defendant's sexual advances. Eventually, during their final sexual encounter, at the end of 2020, JH recalled defendant "tried to coerce" her into having sex, and she attempted to push him off her. That incident occurred when she was drinking alcohol and took an Ambien. She could not recall what happened next. JH's testimony supports a finding of an exploitation of the father-daughter relationship.

As explained earlier, Dr. Henry's expert testimony provided some context and explanation for JH's behavior. His explanation about trauma bonds provided some rationale for why JH would have entered into a seemingly consensual relationship with defendant. When combined with JH's testimony about how she felt throughout her time living with, and having sexual intercourse with, defendant, Dr. Henry's testimony supported that defendant exploited a vulnerable victim. The assessment of 10 points for OV 10 was supported by a preponderance of the evidence.

### 3. OV 13

OV 13 examines whether there was a "continuing pattern of criminal behavior." MCL 777.43(1). The court should assess 25 points for OV 13 when "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c).

When "[n]o pattern of felonious criminal activity existed," the court should not assign any points for OV 13. MCL 777.43(1)(g). When assigning points under OV 13, "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a).

The trial court did not err by assessing 25 points for OV 13. In his Standard 4 brief, defendant argues that the PSIR contained inaccurate information that led the trial court to assess 25 points for OV 13. The PSIR provided, in relevant part, as follows: "25 points were scored for OV 13 as the offender forced victim [JH] to engage in sexual intercourse against her will from March 2020 to November 2020. The unwanted / forced sexual intercourse took place several times over a period of several months." These statements were not erroneous.

There is no dispute that the offenses giving rise to the five counts of CSC-III all occurred within a five-year period. See MCL 777.32(2)(a). Defendant's argument centers, instead, on whether the sexual intercourse was "unwanted" or "forced." However, there is no requirement in OV 13 that the felonious activity involve force or unwanted behavior. Rather, what is required is that the activity involved three or more crimes "against a person." CSC-III is designated as a crime against a person. MCL 777.167. Therefore, defendant's CSC-III convictions would qualify as crimes against a person for purposes of assessing points for OV 13.

Finally, there is no prohibition on considering multiple offenses tried in the same case for purposes of OV 13. In fact, this Court has held that trial court may consider multiple concurrent offenses arising from the same incident as part of the pattern of felonious activity provided that the offenses arise from separate felonious acts. See *People v Carll*, 322 Mich App 690, 705; 915 NW2d 387 (2018); *People v Gibbs*, 299 Mich App 473, 487; 830 NW2d 821 (2013). Here, multiple separate instances of sexual intercourse were alleged. Accordingly, the trial court did not err by considering the five separate criminal sexual conduct counts for purposes of assessing 25 points for OV 13. See *People v Wilkens*, 267 Mich App 728, 743-744; 705 NW2d 728 (2005) (applying the same rationale to a criminal sexual conduct case).

Defendant further argues that because charges the prosecution filed against him for assaulting a prison officer, which were pending during defendant's sentencing, were later dismissed, defendant did not engage in a pattern of three or more crimes against a person. However, defendant's argument overlooks that he was convicted on five counts of CSC-III involving five distinct acts. There is no indication the court considered the assaulting or obstructing charges pertaining to the prison officer, and there was no need for the court to do so because defendant was convicted of five distinct CSC-III crimes. These crimes constituted three or more crimes against a person. Therefore, the trial court did not err by assessing 25 points for OV 13.

### 4. ASSAULTIVE-RISK SCREENING

Next, defendant argues the Assaultive Risk Screening Sheet prepared by the MDOC after defendant's sentencing incorrectly concluded that defendant was a "middle (potential high) assaultive risk." He argues he should have been sent to a low-security prison rather than a high-security prison, where he alleges to have been subjected to harassment. Defendant's argument focuses on the fact that the MDOC categorized him as a middle (potential high) assaultive risk

after concluding the crime description was "Sex Assault." This issue, as well as the issue of defendant's treatment in prison, is not within the scope of this appeal considering that this designation was made by the MDOC following defendant's sentencing, and not by the trial court at sentencing. See MCR 7.202(6)(b)(*ii*) (explaining, in relevant part, that a final order includes the original sentence imposed following a conviction in a criminal case). Therefore, defendant cannot raise this argument against the MDOC in the context of his criminal case.

## 5. RESTITUTION AND NO CONTACT

Finally, defendant argues the trial court should not have ordered him to pay restitution or to have no contact with JH. Defendant provides no legal basis for why either ruling was incorrect, and has therefore abandoned the issue on appeal. See *Payne*, 285 Mich App at 195. Regardless, both rulings were legally permissible. A court shall order the defendant "to 'make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or the victim's estate.' " *People v Garrison*, 495 Mich 362, 367; 852 NW2d 45 (2014) (citation omitted). See also MCL 780.766; MCL 769.1a. Again, defendant provides no legal basis for why the restitution award was improper, particularly considering the evidence that defendant damaged JH's property and caused her emotional harm, and we decline to search for that basis for him.

The same is true for the no-contact order. In *People v Lafey*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361936); slip op at 13, this Court recently noted that "there is some support for the proposition that courts have the inherent authority to impose a limited no-contact order as a condition of sentence for protective, not punitive, purposes." However, in that case, the court's order went beyond the court's authority by prohibiting contact with all individuals outside of prison except legal counsel. *Id*. at ___; slip op at 13. Here, because the court imposed a limited no-contact order for protective purposes, the order fell within the court's inherent authority. The no-contact order did not err by imposing this restriction at sentencing.

## E. VICTIM IMMUNITY

Defendant next argues that the lower courts and prosecution all erred by allowing JH to testify after she was allegedly granted immunity. We disagree.

Defendant did not raise the issue of an alleged witness-immunity error before trial. Therefore, the issue is unpreserved and reviewed for plain error. See *Carines*, 460 Mich at 763. As for defendant's related claim of prosecutorial error,[15] claims of prosecutorial error are preserved when the defendant makes a contemporaneous objection and requests a curative instruction. *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017). Defendant did not make any objection to the alleged instance of prosecutorial error or court error. Therefore, this issue is

---

[15] This Court has explained that less egregious claims are better characterized as "prosecutorial error," and the term "prosecutorial misconduct" should be reserved for only the extreme cases where illegal conduct or conduct violating the Michigan Rules of Professional Conduct is alleged. *People v Cooper*, 309 Mich App 74, 87-77; 867 NW2d 452 (2015).

unpreserved and reviewed for plain error. See *Carines*, 460 Mich at 763; *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007).

The prosecution generally has broad discretion to decide whether to charge a defendant and what charges to bring against the defendant. *People v DeBono*, 346 Mich App 64, 73; 11 NW3d 546 (2023). Defendant claims the prosecution's decision not to charge JH with a crime, and instead to allow her to testify as a witness in this case, constituted an error. He claims the district court and trial court both erred by failing to correct this prosecutorial error. Claims of prosecutorial error are decided on a case-by-case basis. *Isrow*, 339 Mich App at 529. "Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Dobek*, 274 Mich App at 63. The prosecutor generally has great latitude in relation to his or her conduct. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). But the prosecutor must operate within the law and the applicable court rules. *People v Evans*, 335 Mich App 76, 89; 966 NW2d 402 (2020).

The general rule is that witness immunity generally falls within the prosecutor's discretion to request that the court grant a witness immunity. See *People v Schmidt*, 183 Mich App 817, 824; 455 NW2d 430 (1990). Defendant claims the alleged decision to grant JH immunity and allow her to testify violated MCL 767.19a. This statute applies in the context of grand-jury proceedings and provides for a procedure through which a prosecutor may apply to a judge for an order granting immunity to a person who might give testimony before the grand jury.

But the record does not indicate that an order granting immunity was provided in this case. In fact, there is no indication that JH was granted immunity under a court order. Instead, it appears the prosecution simply made a discretionary decision against charging her with a crime, and instead called her as a witness at trial. Because MCL 767.19a did not apply, there was no requirement to follow the procedure set forth therein, and no plain error on the part of the prosecution or the courts occurred.

## F. CHILD-SEXUAL-ABUSE EXPERT

Defendant additionally argues that the trial court erred by admitting evidence by a child-sexual-abuse expert, Dr. Henry, at trial. Again, we disagree.

As explained earlier, "[t]o preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *Aldrich*, 246 Mich App at 113. Defense counsel objected to the admission of Dr. Henry's expert testimony at trial, but on different grounds. He argued that Dr. Henry was not qualified to render any opinions about adult victims. Defendant did *not* argue, as he does on appeal, that Dr. Henry's testimony should not be admitted because the evidence did not support that defendant raped JH. Therefore, because the specific ground for objection asserted on appeal was not raised in the trial court, the issue is unpreserved and reviewed for plain error. See *Carines*, 460 Mich at 763.

In this case, defendant does not challenge Dr. Henry's qualifications or argue that expert testimony was unnecessary. Rather, he argues the trial court erred by admitting expert testimony

to build a rape case against defendant when the evidence did not support that JH was raped. Defendant's argument lacks merit because the prosecution did not maintain that defendant "raped" JH. Rather, Dr. Henry testified about the effect of a trauma bond when an adult victim has been abused in childhood, which can make it difficult to set boundaries in the relationship. Dr. Henry's testimony was relevant to JH's state of mind, and to explain why she may have entered into a seemingly consensual sexual relationship and living situation with defendant. Thus, defendant has not demonstrated plain error.

## G. 180-DAY RULE

Next, defendant argues the trial court erred by failing to dismiss the case under the 180-day rule because defendant waited more than six months for an independent forensic examination. We disagree.

A motion to dismiss based on a violation of the 180-day rule is reviewed for an abuse of discretion. *People v Witkoski*, 341 Mich App 54, 59; 988 NW2d 790 (2022). MCL 780.131(1) outlines the requirements under the 180-day rule and provides, in relevant part:

> Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint.

When a violation of the 180-day rule occurs, "no court of this state shall any longer have jurisdiction thereof, nor shall the untried warrant, indictment, information or complaint be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." MCL 780.133. A violation of the 180-day rule is distinct from a speedy trial violation. *Witkoski*, 341 Mich App at 60. Also, under the 180-day rule, trial does not necessarily have to occur within 180 days. *Id*. "Rather, if apparent good-faith action is taken well within the period and the people proceed promptly and with dispatch thereafter toward readying the case for trial, the condition of the statute for the court's retention of jurisdiction is met." *Id*. (quotation marks and citation omitted). In other words,

> the rule requires dismissal of the case if the prosecution fails to commence action on charges pending against an inmate within 180 days after the [Department] delivers notice of the inmate's imprisonment . . . [b]ut the rule does not require that a *trial* be commenced or completed within 180 days of the date notice was delivered. [*Id*. at 61 (quotation marks and citations omitted; first alteration in original).]

The prosecutor must act promptly to move the case to the point in which it is ready for trial within the 180-day period. *Id*.

Defendant's argument appears to hinge on a mistaken belief that the 180-day rule requires that he be tried within 180 days of the commencement of the case, which is not accurate. Rather, there is no dispute the prosecution commenced this matter timely within the 180-day-rule requirements. See MCL 780.131(1); *Witkoski*, 341 Mich App at 61. There is likewise no evidence in the record that the MDOC delivered written notice of the place of imprisonment and a request for final disposition of the case, as is required to trigger the requirements of MCL 780.131(1). Even assuming such written notice occurred, the rule does not require that a trial commence or be completed within the 180-day period. The delay in proceedings throughout the summer and fall of 2022 was caused by defendant's request for an independent forensic examination, and the delays were attributed to the forensic examiner's schedule and some administrative matters attendant to securing the independent forensic examination from the public defender's office. The record does not support that any of the delay can be attributed to the prosecution, or that the prosecution failed to act in good faith or promptly to bring this case to trial. For these reasons, defendant's 180-day-rule argument lacks merit.

## H. UNLAWFUL SURVEILLANCE

Defendant also argues the trial court erred by proceeding with trial while defendant was subjected to unlawful surveillance, weaponization, and eavesdropping at the jail. We disagree.

We review this constitutional issue de novo. *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021). Defendant's argument appears to be a claim that he was subjected to cruel or unusual punishment while incarcerated, which the court should have taken into consideration during either trial or sentencing. "The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII." *Id*. at 636 (emphasis original, quotation marks and citation omitted). But defendant does not articulate the basis for his claims, beyond referring to cruel or unusual punishment. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims . . . ." *People v Cameron*, 319 Mich App 215, 228 n 7; 900 NW2d 658 (2017) (quotation marks and citation omitted). Therefore, defendant's argument lacks merit.

## I. JURY INSTRUCTIONS

Defendant also argues the trial court erred by failing to instruct the jury that JH was defendant's wife under his religion and that his marriage was protected under equal-protection principles and under the Civil Rights Act (CRA), MCL 37.2101 *et seq*. We conclude the issue was waived when defense counsel indicated he had no objection to the jury instructions. See *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019).

Because the instructional error is waived, we review the issue through the lens of ineffective assistance. "[A] jury instruction that improperly omits an element of a crime amounts to a constitutional error." *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012) (quotation marks and citation omitted; alteration in original). A defendant's challenge to the jury instruction will be considered in its entirety to determine whether an error occurred. *Id*.

As discussed earlier, defendant's argument that he had a "spiritual marriage" recognized by law is without merit. The CRA is a civil statute that does not provide a defense to the incest charges in this case. See MCL 37.2101 (explaining that the statutory scheme relates to employment, housing, real estate, public accommodations, public services, and education facilities). So, no error arose from the fact that the trial court did not instruct the jury about defendant's unfounded claims to be married to JH under his religion.

As for defendant's argument that "nonmarriage" is an element of CSC-III, while MCL 750.520d(1)(d) does not apply when there is a lawful marriage between the defendant and the other party, defendant could not have a lawful marriage with JH because he is her father. See MCL 551.3 (providing, in relevant part, that a man cannot marry his own daughter). So the trial court did not err by failing to instruct the jury that MCL 750.520d(1)(d) does not apply when the parties have a "lawful marriage."

Defendant does not explain his other argument that the court erred by instructing the jury that it would need to find defendant and JH were related by blood or marriage within the third degree as biological father and biological daughter. Jury instructions must clearly present the case, the applicable law, and all elements of the charged offense. *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005). In this case, for each CSC-III count, the trial court properly instructed the jury that it must find that the parties were related by blood or marriage, within the third degree, as biological father and daughter. This language corresponded with the statute. See MCL 750.520d(1)(d). There is no dispute that defendant is JH's biological father. Therefore, defendant has not established any instructional error, and counsel was not ineffective for failing to raise a futile objection to the instructions. See *Ericksen*, 288 Mich App at 201.

## J. RIGHT TO BE INFORMED

Next, defendant argues he was deprived of his due-process right to be informed of the evidence used to convict him, specifically, the jury notes from deliberations. We disagree.

Defendant's argument centers on the trial court's instruction to the jurors during the second day of trial that their notes would not be examined by anyone and that once the trial concluded, the notes would be collected and destroyed. Once again, this issue is unpreserved as defendant did not object to the instruction, the issue is unpreserved, and will be reviewed for plain error. See *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000); *People v Borgne*, 483 Mich 178, 184; 768 NW2d 290 (2009); and *Aldrich*, 246 Mich App at 125.

This Court has recognized "the sanctity of private jury deliberations." *People v Caddell*, 332 Mich App 27, 43; 955 NW2d 488 (2020). As this Court has explained:

> The secrecy of jury deliberations is a vital part of our jury-trial system, as secrecy provides jurors with the freedom to discuss all aspects of a case and engage in the free-flow of ideas, concerns, and opinions regarding, as in this case, the guilt or innocence of a fellow community member. [*Id.*]

Therefore, the trial court may not " 'intrude on the secrecy of the jury's deliberations.' " *Id*. at 44 (citation omitted). MCR 2.513(H) adds:

The court may permit the jurors to take notes regarding the evidence presented in court. If the court permits note taking, it must instruct the jurors that they need not take notes, and they should not permit note taking to interfere with their attentiveness. If the court allows jurors to take notes, jurors must be allowed to refer to their notes during deliberations, but the court must instruct the jurors to keep their notes confidential except as to other jurors during deliberations. The court shall ensure that all juror notes are collected and destroyed when the trial is concluded.

The trial court instructed the jurors that their notes would be collected and destroyed after the trial concluded in compliance with MCR 2.513(H). Defendant had no due-process right to review the notes, and he cites no authority in support of his position. Thus, the trial court did not commit a plain error.

K. BINDOVER

Additionally, defendant argues that the district court judge was biased against him, as indicated by a "pro-feminist" statement he made during the preliminary examination, and that insufficient evidence supported his bindover. We disagree on the gender-bias issue and conclude any error in the bindover was harmless.

Defendant did not file a pretrial motion to quash the information. Therefore, the issue is unpreserved. *People v Francis*, 347 Mich App 560, 566; 16 NW3d 323 (2023). We review this unpreserved issue for plain error. See *Carines*, 460 Mich at 763. The purpose of the preliminary examination is to determine whether a felony was committed and whether probable cause exists to believe that the defendant was the person who committed it. *People v Yost*, 468 Mich 122, 125-126; 659 NW2d 604 (2003). "In order to bind a defendant over for trial in the circuit court, the district court must find probable cause that the defendant committed a felony based on there being evidence of each element of the crime charged or evidence from which the elements may be inferred." *People v Simon*, 339 Mich App 568, 580; 984 NW2d 800 (2021) (quotation marks and citation omitted). The district court's role is to consider the weight of the evidence and the credibility of witnesses during the preliminary examination. *People v Anderson*, 501 Mich 175, 184; 912 NW2d 503 (2018).

The district court ruled, in relevant part, as follows:

I agree with you, [defense counsel], that [a showing of force or coercion or some other indicia] wasn't presented. What was presented was overwhelming proof that [defendant] put his penis inside his daughter not less than two times, performed cunnilingus on his daughter not less than two times, and penetrated her vagina with a strap-on not less than one time, that these incidents occurred over a period of time from May of 2019 and continuing until his hospitalization on or after December of 2020 at two different locations within the City of Warren. The obligation to keep his body in lack of sexual activities relates to a father not doing this to his child, his daughter. I'm overwhelmingly satisfied that the law precludes this conduct, whether purported consensual or not. I'm looking at the face of [JH] as she testified, I'm overwhelmingly satisfied that the pain on her face as she was

-39-

answering these questions does confirm the fact that her father perpetrated these five separate criminal acts.

Defendant is bound over as charged on a five-count complaint, CSC in the third degree, based on the record we've stated.

The district court's ruling did not demonstrate any bias against defendant based on his gender. The trial court's ruling was based on the elements of CSC-III on an incest theory, including that defendant and JH were related as father and daughter, and that defendant engaged in sexual activities covered under the statute at least five times. See MCL 750.520d(1)(d). Regarding the court's comment that JH showed pain on her face as she was testifying, the district court's role is to determine the credibility of witnesses during the preliminary examination, meaning the comment was an appropriate finding on JH's credibility. See *Anderson*, 501 Mich at 184. Additionally, on the issue whether sufficient evidence supported the bindover, any error was harmless considering that sufficient evidence supported defendant's convictions. See *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010).

## L. INEFFECTIVE ASSISTANCE—GRAND JURY PROCEEDING

Defendant argues that counsel was ineffective for failing to argue that under MCL 767.26 that defendant was entitled to a dismissal of his case because he was not indicted by a nine-person grand jury under MCL 767.23. We disagree.

Defendant did not raise this ineffective-assistance issue by moving the trial court for a new trial or a *Ginther* hearing, *Heft*, 299 Mich App at 80, by moving this Court to remand the case for a *Ginther* hearing specific to this issue, *Abcumby-Blair*, 335 Mich App at 227, or by mentioning this issue in his motion for remand. Therefore, the issue is unpreserved and reviewed for errors apparent on the record. See *Hoang*, 328 Mich App at 63.

In Michigan, there are two ways in which criminal prosecutions may be initiated. *People v Glass*, 464 Mich 266, 277; 627 NW2d 261 (2001). The first is through the procedure used in this case, when an information is filed on the basis of a signed complaint and warrant stating the substance of the accusation against the defendant and reasonable cause to believe the defendant committed the crime. *Id*. The second is through a grand-jury indictment. *Id*. at 278. Our Supreme Court has held that "[t]here is no state constitutional right to indictment by grand jury; rather, indictment by grand jury is an alternative charging procedure created by the Legislature." *Id*.

Defendant did not have a constitutional right to an indictment by a grand jury. Defendant relies on MCL 767.26, but that statute does not provide a right to a grand-jury proceeding; rather that statute provides for discharge of the accused individual held in prison on charges if that person is not indicted within a certain time frame. Because defendant was charged through information procedure, MCL 767.26 would not apply to his case. Accordingly, counsel did not render ineffective assistance because an argument on this issue would have lacked merit. See *Ericksen*, 288 Mich App at 201.

## M. ALTERNATIVE INEFFECTIVE-ASSISTANCE CLAIMS

For most of the issues raised in his Standard 4 brief, defendant raises an alternative ineffective-assistance claim. Because none of the unpreserved issues raised in defendant's Standard 4 brief would have had merit had counsel raised the issue, defendant cannot establish ineffective assistance because an objection or argument on the issue would have lacked merit. See *Ericksen*, 288 Mich App at 201.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Randy J. Wallace